**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **Plaintiff,** | : | CASE NO.:  2:17-CR-00146-002 |
| **V.** | : | HONORABLE ALGENON MARBLEY |
| **GIFTY KUSI.** | : | |
| **Defendants.** | : | |

**GIFTY KUSI'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE, AND/OR LATERAL VARIANCE**

*United States v. Booker*, 543 U.S. 220, 226 (2005), rendered the U.S. Sentencing Commission Guidelines ("Guidelines") purely advisory. The Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. *See* 18 U.S.C. § 3553(a)(2). As discussed below, the Guideline calculation shown in the presentence report should not be applied because it far exceeds a level that is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing.

I. **Advisory Sentencing Guidelines Range**

Gifty disputes the applicability of the loss amount and the Guideline enhancements shown in the Presentence Investigation Report ("PSR") and asks the Court to reject them. The PSR calculation is 97 to 121 months.  Gifty calculates the advisory Guidelines range differently and submits that, since the government has not met its burden to prove a loss amount by any thoughtful

calculation, the correctly calculated Guidelines range results in an advisory sentence of 0 to 6 months.

### A. Loss Amount

The government's $3,207,491.22 loss calculation is grossly overstated, and the PSR recommends a loss amount in lockstep with the government despite the submission of an expert report. The PSR did not include Gifty's transcript excerpts for counseling claims, transcript excerpts for compound creams, and expert report of Frank Cohen. See Darrell Bryant Sentencing Memorandum Exhibits **A, B, and C**, respectively.

The jury verdict alone does not carry the government's burden to prove the loss calculation. The government's calculation is based on an overbroad interpretation of the jury's verdict, as well as an unscientific extrapolation. This case did not involve an entirely fraudulent medical clinic where all services were fraudulent. *Cf. United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013) (stating that the district court "would have been justified in finding the amount of loss to be the entire $3.32 million because it found that the entire wellness program was a sham"). Rather, the evidence at trial showed that the clinic also rendered legitimate services. The Sixth Circuit recognizes, "In cases where a defendant's fraud is not so far- reaching and evidence is presented to distinguish legitimate claims from fraudulent ones, further explanation of the bases for the Government's loss calculation may be necessary . . . ." *United States v. Lovett*, No. 17-2209, 2019 WL 994309, at *8 (6th Cir. Mar. 1, 2019). "[T]o calculate loss for sentencing purposes, the value of any *legitimate* claims, if established, must be offset against the aggregate billings." *United States v. Mehmood*, 742 Fed. Appx. 928, 941 (6th Cir. 2018); *United States v. Mahmud*, 541 Fed. Appx. 630, 636 (6th Cir. 2013) (stating, in a case involving billing for procedures never performed, that the defendant "should not be punished for services he actually rendered"); *see also United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013) (stating that the loss amount

2

"is to be reduced by the fair market value of actual services rendered to the victim").

### i. Billed versus Paid

The PSR loss amount reflects amounts billed to health care benefit programs rather than paid. Loss under the Guidelines is the greater of "actual loss" (the "reasonably foreseeable pecuniary harm that resulted from the offense") and "intended loss" (the "pecuniary harm that the defendant purposely sought to inflict"). U.S.S.G. § 2B1.1, cmt. n.3(A). In the health care fraud context, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program" is only prima facie evidence of the amount of intended loss. *Id.* at cmt. n.3(F)(viii). The prima facie evidence can be rebutted by evidence that the defendant was aware that the programs would not remit the full amount billed. *Id.*; *see United States v. Bertram*, 900 F.3d 743, 752 (6th Cir. 2018) ("Under the guidelines, defendants can rebut the presumption that intended loss is the amount billed with evidence that they never intended to receive that amount.") In health care cases, the amount paid should be used to calculate the loss amount, as it is widely known that health care reimbursement are tied to fee schedules and medical codes and that billed amounts are irrelevant. The government's pervasive theme at trial was that the Defendants were savvy and knew the money to be made in running their businesses. Thus, in calculating the Guidelines loss, the actual amount paid by the insurance carriers should be used. Additionally, it is clear from the testimony that Medicaid pays in accordance with a published fee schedule, and that no matter what amount is billed to the program, Medicaid will only pay at or below the published fee schedule.  Therefore, the billed amounts are immaterial to the calculation of intended loss, and paid amount instead should be used to calculate loss in this case.

### ii. Improper Extrapolation

The government said it best in closing argument: "But the point is, we just gave examples." PAGEID # 2151. Based on sparse examples and very generalized testimony, the government asks

that **all** amounts billed for compound creams, counseling, and more, be counted for guidelines loss. There is no sound basis for this conclusion.

There is a correct way to conduct statistical sampling and extrapolation of loss in health care billing cases, and the government did not do it in this case. The government publishes guidance on how to perform statistical sampling and extrapolation. *See, e.g.*, Chapter 8 of the Medicare Program Integrity Manual. Yet the government did not follow its own guidance. Defendant provided the Probation Officer and the government with an expert report of Frank Cohen, who explains the way to perform a statistically valid sample and extrapolation. Exhibit C. Without reiterating the contents of the report herein, it is evident that the government's calculation has no sound basis.

### iii. Counseling

The PSR identified $1,621,445.10 as the amount billed for fraudulent counseling claims, and $1,101,808.71 as the amount paid. PSR, par. 26. However, Government's Exhibit 301 shows only the following for counseling claims.

| Code | Procedure | # of Claims | Billed | Paid | First Service | Last Service |
|---|---|---|---|---|---|---|
| 90791 | Psychiatric Diagnostic Eval | 955 | $124,894.69 | $99,427.36 | 12/18/2015 | 1/10/2017 |
| 90832 | Psychotherapy w/Patient 30 Min | 4 | $253.48 | $180.56 | 11/4/2016 | 12/12/2016 |
| 90833 | Psychotherapy w/Patient w/E&M Srvcs 30 Min | 69 | $4,554.69 | $2,087.25 | 8/11/2016 | 12/5/2016 |
| 90834 | Psychotherapy w/Patient 45 Min | 13 | $1,138.28 | $760.05 | 4/14/2016 | 1/21/2017 |
| 90836 | Psychotherapy w/Patient w/E&M Srvcs 45 Min | 24 | $2,019.47 | $1,175.58 | 4/9/2016 | 1/16/2017 |
| 90837 | Psychotherapy w/Patient 60 Min | 1018 | $129,043.69 | $84,248.92 | 2/19/2016 | 1/24/2017 |
| 90838 | Psychotherapy w/Patient W/E&M Srvcs 60 Min | 8682 | $952,210.54 | $661,307.26 | 12/26/2015 | 1/26/2017 |
| 90853 | Group Psychotherapy | 63 | $3,789.43 | $1,197.62 | 8/11/2016 | 11/11/2016 |
| | | | **$1,217,904.27 BILLED** | **$850,384.60 PAID** | | |

4

The remaining codes in Government's Exhibit 301 for urinalyses, office visits, etc. are plainly not counseling services. If, for argument's sake, we were to presume all counseling claims were fraudulent, the *starting point* for loss can be calculated at no more than $850,384.60 (paid). However, the government cannot prove all of this as loss. Right away, we can subtract the $1,197.62 paid for group therapy since the government's position is that group therapy was indeed rendered. We can also subtract $99,427.36 paid for the initial diagnostic evaluation since the record is void of evidence disputing these services. With those subtractions, the theoretical top-end loss amount for counseling claims can be no more than **$749,759.62**.

The PSR states two bases to justify the $1,621,445.10 loss amount for counseling: (1) qualified supervising physicians needed to be present during sessions provided by CDCAs; and (2) "since **all** sessions were provided in a group setting but billed as individual services, there is no need for the Government to extrapolate the loss figures concerning these bills." Addendum to the Presentence Report p. 5, par. 1-2, emphasis added. The record does not support these conclusions. First, as mentioned above, there was no analysis of the credentials of each and every counselor rendering services during the relevant time period. Second, the government's expert testified that the supervision requirements would *not* have applied during the relevant time period:

> Q. Okay. And so, if the defendants were raided in September of 2016, it would be unfair to suggest that they weren't -- the counselors weren't being supervised in accordance with the regulation?
>
> A. So there would have still been a requirement of supervision, and that would have had to look like something. There would have been some documents of supervision. I haven't seen everything. But, as far as the requirements of once weekly supervision and the requirements of directly observed clinical work **would not have applied**.
>
> Q. And who would the supervisor be?
>
> A. It would have -- it would have been -- there is a number of credentials that could do that…

5

PAGEID # 932-33, emphasis added. Addendum to the Presentence Report p. 5, par. 1-2.

Third, the evidentiary record shows divided testimony concerning patients' experience with counseling. Some witnesses testified that there was indeed individual counseling (e.g. Clients 4, 5, Milks). *See*, Exhibit B. Some testified that there was group counseling (e.g. Clients 1, 2, 4, 5, 13, 14, Notturniano, Milks, Perison). *See,* Exhibit B. Others testified that there was art therapy (Clients 2, 4, 5, Milks). *See*, Exhibit B. In addition, the government did not identify or qualify experts to testify about each counselor's specific licensure and whether they were qualified under the laws of the State of Ohio to render the services billed. No experts were identified or qualified to testify about specific codes billed for counseling, the necessary components to bill one code versus another, and why the codes billed on any specific dates of service were improperly used or billed.

Due to the government's failure to identify specific fraudulent claims and improper extrapolation, the loss amount for counseling must be calculated at $0.00.

### iv. Compound Creams

The PSR reflects a loss of $2,105,682.51 for compound creams. This is based on the conclusion that 100% of claims billed under Drs. Oppong, Rivera, and "others" (whoever they are), are fraudulent. There is a correct way to conduct statistical sampling and extrapolation of loss in health care billing cases and the government did not do it in this case. Some of this guidance is based on the Government's own publications. *See, e.g.,* Chapter 8 of the Medicare Program Integrity Manual. Defendant provided the Probation Officer and the United States with an expert report of Frank Cohen. Exhibit C. Without reiterating the contents of the report herein, it is evident that the government's calculation has no sound basis.

The government may very well be able to demonstrate a few examples of incorrectly billed services based upon the testimony of specific patients. As discussed in the Cohen report, the

6

cherry-picked sample of trial witnesses cannot serve as a valid statistical sample from which to extrapolate a 100% loss. Moreover, there is no evidence in the record to demonstrate that claims for compounds associated with Dr. Oppong and "Other Prescriber[s]" referenced in Government's Exhibit 300 were in any way fraudulent. Therefore, the theoretical top-end loss amount for compound creams cannot, at the very most, exceed those associated with Dr. Rivera: $1,312,026.06. Government's Exhibit 300.

### v. Loss: Conclusion

Based on the foregoing, the government has not met its burden to prove a loss amount, and instead arrived at an exorbitant figure based on scientifically unsound methodology. *See,* Exhibit C. Even if the Court entertains the government's argument that loss equates to 100% of claims for counseling and compound creams- the theoretical top-end, pie-in-the-sky, 100% loss amount can be no more than $749,759.62 *paid* for counseling claims and $1,312,026.06 *paid* for compound creams, for a total loss of $2,061,785.68. (Cf. $3,727,127.61 *billed* as stated in PSR par. 24). Gifty not concede this amount, but at the very least it takes the Guidelines loss to the lower end of a 16-level increase, rather than an 18-level increase. U.S.S.G. §2B1.1; PSR par. 34.

### B. Guideline Enhancements

#### i. Aggravating Role (PSR, par. 36-38.)

An adjustment for aggravating role under § 3B1.1(a) is inappropriate. The organization was not "otherwise extensive" § 3B1.1 cmt. n.3. The evidence shows that the employees and other physicians thought that the services they themselves rendered were legitimate. Patients testified that they received services and recovered from drug addiction. It is the billing aspect of the operation that is alleged to be fraudulent. Defendants therefore did not use "the unknowing services of many outsiders" and this adjustment does not apply.

7

Additionally, there is no testimony that Gifty directed anyone to falsely bill. Also, there is no evidence that Defendants "kept all of the fruits of the crime." Dr. Rivera kept money as did others. The government's own analyst from the FBI and his financial documents show that out of the millions paid to H&W, a fraction went into Defendants' pockets. Rent and other expenses such as payroll were paid to run the businesses. The Presentence report itself shows that Gifty does not have luxury items procured during the relevant time period.

      ii.    **Position of Trust** (PSR, par 39-41.)

An adjustment for position of trust should not apply because § 3B1.3 states that "[t]his adjustment may not be employed if an abuse of trust ... is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. It was only by virtue of Defendant's position as owner of a Medicaid provider that she was able to commit the base offense of health care fraud in the first place. An enhancement over the base offense is therefore inappropriate. **18 U.S.C. § 3553 factors justify a variance.**

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553 and in doing so should consider the following:

- 18 U.S.C. § 3553(1): the nature and circumstances of the offense and the history and characteristics of the defendant.

Darrell was raised in a single-parent household where his mother worked to provide for him while his father was in prison. Darrell received several degrees, including a Doctor of Pharmacy, from the Ohio State University, and has no criminal history. The attached letters of support provide further insight into Darrell's character. Collectively Attached Exhibit A. Currently, Gifty Kusi has two young children- a son who is approximately 2 years old, and a baby girl, born in early summer 2019. By virtue of her conviction and sentence (if it exceeds 1 year) Gifty will be deported. If Gifty is deported and her husband Darrell serves 120 months (as recommended in the

PSR), these children will have no parents in their lives for the next decade. She has **NO** criminal history.

This is a financial crime and it is likely that Darrell and Gifty's assets will satisfy any order of restitution, thereby making the government whole. The full payment of restitution and minimal period of incarceration will be a sufficient sentence in this matter.

- 18 U.S.C. § 3553(2): the need for the sentence imposed—
    - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    - (B) to afford adequate deterrence to criminal conduct;
    - (C) to protect the public from further crimes of the defendant.

Deterrence and public protection will happen by operation of law and need not be enhanced by this Court's sentence. Under 42 U.S.C. §1320a-7(a)(3), Gifty will be excluded from participation in federal health care programs for a minimum of 5 years.

> The effect of an exclusion is that no payment will be made by any Federal health care program for any items or services furnished, ordered or prescribed by an excluded individual or entity. This payment prohibition applies to the excluded person, anyone who employs or contracts with the excluded person, any hospital or other provider for which the excluded person provides services, and anyone else. The exclusion applies regardless of who submits the claims and applies to all administrative and management services furnished by the excluded person.

U.S. Department of Health and Human Services Office of the Inspector General, *Exclusions FAQ*, https://oig.hhs.gov/faqs/exclusions-faq.asp (last visited October 10, 2019). Moreover, Gifty's pharmacy license has been suspended by the State of Ohio.

- 18 U.S.C. § 3553(3): the kinds of sentences available.

The court is permitted to pronounce a sentence anywhere from probation to the statutory maximum. *Booker*, at 226. See also, PSR, par. 84-91. If this Court's guideline calculation aligns with that shown in the PSR, Defendant requests a variance from the draconian Guidelines range.

Respectfully submitted,

/s/ J. Anthony Rich

J. Anthony Rich (0066295)
Counsel for Defendant
The City Center
300 Broadway, Suite 101-B
Lorain, OH 44052
440.245.2274
440.244.0811 fax
anthony@janthonyrich.com

### *CERTIFICATE OF SERVICE*

A copy of the foregoing was delivered via e-mail this  15th   day of October  2019 to the United States Attorney's Office.

/J. Anthony Rich/
_____

J. Anthony Rich (0066295)
Counsel for Defendant